IN THE SUPREME COURT OF NORTH CAROLINA

No. 326PA18

Filed 14 August 2020

RAYMOND A. DA SILVA, Executor of the Estate of DOLORES J. PIERCE

v.

WAKEMED, WAKEMED d/b/a WAKEMED CARY HOSPITAL, and WAKEMED
FACULTY PRACTICE PLAN

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous,
unpublished decision of the Court of Appeals, 817 S.E.2d 628, 2018 WL 3978021 (N.C.
Ct. App. 2018), reversing an order entered on 13 February 2017 and an order entered
on 20 February 2017 and vacating an order entered on 13 February 2017 by Judge
Robert H. Hobgood in Superior Court, Wake County. Heard in the Supreme Court on
15 June 2020.

*Law Offices of Gregory M. Kash, by Gregory M. Kash, for plaintiff-appellee.*

*Fox Rothschild LLP, by Matthew Nis Leerberg; and Smith, Anderson, Blount,
Dorsett, Mitchell & Jernigan, L.L.P., by John D. Madden and Robert E.
Desmond, for defendant-appellants.*

*Stephen J. Gugenheim and Anna Kalarites for North Carolina Advocates for
Justice, amicus curiae.*

HUDSON, Justice.

Here, we must determine whether an internist proffered by plaintiff to provide
standard of care expert testimony against three hospitalists is properly qualified
under Rule 702(b) of the North Carolina Rules of Evidence. We conclude that

plaintiff's expert is qualified and affirm the decision of the Court of Appeals. We also must decide whether there is sufficient evidence in the record to raise a genuine issue of material fact that the hospitalists proximately caused plaintiff's injury. We conclude that the record evidence here was sufficient and thus also affirm the decision of the Court of Appeals as to this issue.

## I.     Factual & Procedural History

This case began when a 76-year-old woman, Dolores Pierce, was hospitalized at WakeMed Cary Hospital from 30 October 2012 to 5 November 2012. Mrs. Pierce had been taking a daily dose of prednisone—a corticosteroid used to treat an inflammatory disorder—for years before being hospitalized. At the WakeMed Cary emergency room, she presented with fever, altered mental status, and weakness; she was presumed to have a urinary tract infection. Concerned that an infection had induced sepsis, emergency room personnel collected urine and blood cultures and a physician ordered the antibiotic Levaquin to be administered intravenously.

Levaquin is an antibiotic commonly used to treat infection. Levaquin has a "black box" warning,[1] the strongest warning required by the Food and Drug Administration (FDA). The "black box" on Levaquin warns of an increased risk of tendon ruptures in patients over sixty years old and in patients who are

---

[1] 21 C.F.R. § 201.57(c)(1) (2015).

concomitantly taking a corticosteroid. The most prevalent tendon rupture attributable to Levaquin use is the rupture of the Achilles tendon.

Within hours of arriving at the emergency room, Mrs. Pierce was admitted to a telemetry-intermediate care floor and came under the care of physicians at WakeMed Cary Hospital, three of whom are relevant here: Dr. Jenkins, Dr. Daud, and Dr. Afridi (the hospitalists). All three of these doctors are board certified in internal medicine, and they all identify themselves as hospitalists—physicians who specialize in internal medicine in a hospital setting and care for hospitalized patients.

During Mrs. Pierce's stay, each of these hospitalists prescribed her Levaquin and continued her on a daily dose of prednisone. All three doctors testified that they were familiar with Levaquin and its "black box" warning at the time they prescribed the medication. They also testified that they were aware Mrs. Pierce was over the age of sixty and was taking a corticosteroid.

When Mrs. Pierce was ultimately discharged to a rehabilitation facility, Dr. Afridi's discharge orders included orders to continue Mrs. Pierce on Levaquin and prednisone. Per those orders, both drugs were administered through 9 November 2012 at the rehabilitation facility. Mrs. Pierce was discharged within the next few days. Roughly a week after her discharge, Mrs. Pierce's Achilles tendon ruptured, and she had to undergo tendon repair surgery. She never fully recovered and ultimately died from pneumonia and debility on 7 September 2013.

Raymond Da Silva, the executor of Mrs. Pierce's estate, brought this medical malpractice action seeking recovery for the tendon rupture and Mrs. Pierce's

resulting injury and death. The only claims remaining arise from the hospitalists' alleged medical negligence. Mr. Da Silva is thus the plaintiff in this capacity.

During discovery, plaintiff identified experts and provided the deposition of Dr. Paul Genecin as expert testimony on the standard of care in compliance with Rule 26(b)(4) of the North Carolina Rules of Civil Procedure. Defendant moved to disqualify Dr. Genecin and moved for summary judgment on the issue of proximate cause. The trial court concluded that Dr. Genecin did not qualify as an expert. Because Dr. Genecin was plaintiff's only "standard of care" expert, the trial court granted summary judgment for defendant based on plaintiff's failure to provide any evidence proving a violation of the standard of care. The trial court also granted summary judgment for defendant on the issue of proximate cause.

Plaintiff appealed. The Court of Appeals unanimously concluded that Dr. Genecin was competent to testify as to the standard of care and that his testimony sufficiently forecasted proximate cause. *Da Silva v. WakeMed*, 817 S.E.2d 628, 2018 WL 3978021, at *9, *11 (N.C. Ct. App. 2018). As a result, the Court of Appeals reversed the trial court's order disqualifying Dr. Genecin as an expert witness, vacated the trial court's order granting summary judgment due to lack of expert testimony, and reversed the trial court's order granting summary judgment due to lack of evidence of proximate cause. *Id.* at *11. Defendant filed a petition for discretionary review, which we allowed. We now affirm the decision of the Court of Appeals.

## II.    Rule 702(b)

### A. Standard of Review

Generally, the trial court's decision to allow or disqualify an expert "will not be reversed on appeal absent a showing of abuse of discretion." *State v. McGrady*, 368 N.C. 880, 893, 787 S.E.2d 1, 11 (2016) (quoting *Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 458, 597 S.E.2d 674, 686 (2004)). "The standard of review remains the same whether the trial court has admitted or excluded the testimony—even when the exclusion of expert testimony results in summary judgment and thereby becomes 'outcome determinative.' " *Id.* at 893, 787 S.E.2d at 11 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142–43 (1997)).

However, when the pertinent inquiry on appeal is based on a question of law—such as whether the trial court properly interpreted and applied the language of a statute—we conduct de novo review. [2] Here, plaintiff argues that the trial court erred as a matter of law by misinterpreting and misapplying Rule 702 and disqualifying Dr. Genecin as an expert. Consequently, we review this issue de novo. *Morris Commc'ns Corp. v. City of Bessemer City Zoning Bd. of Adjustment*, 365 N.C. 152, 155, 712 S.E.2d 868, 871 (2011) ("Reviewing courts apply de novo review to alleged errors of law[.]").

---

[2] Additionally, an error of law is an abuse of discretion. *See Koon v. United States*, 518 U.S. 81, 100 (1996) ("A [trial] court by definition abuses its discretion when it makes an error of law."); s*ee also Matter of A.U.D.*, 373 N.C. 3, 13, 832 S.E.2d 698, 704 (2019) (Newby, J., dissenting) ("A trial court's misapplication of the law is an abuse of discretion.").

## B. Rule 702(b)

Rule 702(b) of the North Carolina Rules of Evidence provides:

(b) In a medical malpractice action as defined in G.S. 90-21.11, a person shall not give expert testimony on the appropriate standard of health care as defined in G.S. 90-21.12 unless the person is a licensed health care provider in this State or another state and meets the following criteria:

(1) If the party against whom or on whose behalf the testimony is offered is a specialist, the expert witness must:

a. Specialize in the same specialty as the party against whom or on whose behalf the testimony is offered; or

b. Specialize in a similar specialty which includes within its specialty the performance of the procedure that is the subject of the complaint and have prior experience treating similar patients.

(2) During the year immediately preceding the date of the occurrence that is the basis for the action, the expert witness must have devoted a majority of his or her professional time to either or both of the following:

a. The active clinical practice of the same health profession in which the party against whom or on whose behalf the testimony is offered, and if that party is a specialist, the active clinical practice of the same specialty or a similar specialty which includes within its specialty the performance of the procedure that is the subject of the complaint and have prior experience treating similar patients; or

b. The instruction of students in an accredited health professional school or

accredited residency or clinical research program in the same health profession in which the party against whom or on whose behalf the testimony is offered, and if that party is a specialist, an accredited health professional school or accredited residency or clinical research program in the same specialty.

N.C. R. Evid. 702(b) (2019). From the language of this rule, we discern the following three requirements that Dr. Genecin must fulfill in order to provide expert testimony against the hospitalists, who hold themselves out as specialists[3]:

(1) Dr. Genecin must be a licensed health care provider in North Carolina or another state;

(2) Dr. Genecin must have the same specialty as the hospitalists or have a similar specialty; if Dr. Genecin has a similar specialty, his specialty must include the performance of the procedure that is the subject of the complaint and he must have prior experience treating patients similar to plaintiff; and

(3) Dr. Genecin must have devoted the majority of his professional time to either the active clinical practice of the same or similar specialty as the hospitalists and/or the instruction of students in the same specialty during the year immediately preceding plaintiff's hospitalization.

We examine the record for evidence of each of these three requirements.

---

[3] *See FormyDuval v. Bunn*, 138 N.C. App. 381, 388, 530 S.E.2d 96, 101 (2000) ("We thus hold that a doctor who is either board certified in a specialty or who holds himself out to be a specialist or limits his practice to a specific field of medicine is properly deemed a "specialist" for purposes of Rule 702.").

## C. Dr. Genecin's Qualifications

First, we note that Dr. Genecin testified in his video deposition that he is a licensed health care provider in Connecticut. Defendant lodged no objection to this testimony.

Second, we must determine whether Dr. Genecin has the same or similar specialty as the hospitalists. The record shows that Dr. Genecin is board certified in internal medicine, meaning that he specializes in and is known as an internist. As noted above, defendant's physicians hold themselves out as hospitalists, meaning that they specialize in internal medicine in a hospital setting and care for hospitalized patients. Like, Dr. Genecin, the hospitalists are all board certified in internal medicine. The hospitalists and Dr. Genecin also have similar education, training, and experience. Though Dr. Genecin's practice is broader in scope, it includes the scope of the hospitalists' practice. Dr. Genecin testified that "[a] hospitalist is a job title that an internal medicine doctor can assume by going to work full time for a hospital. The work that a hospitalist does is the same work as any internist who cares for hospitalized patients." The record reveals no evidence to the contrary. Based on the evidence here that Dr. Genecin and the hospitalists all practice within the same scope of internal medicine, we conclude that the evidence shows that here, internist and hospitalist are similar specialties.[4]

---

[4] We express no opinion here as to whether internist and hospitalist are the *same* specialty.

Next, we examine the record to see whether Dr. Genecin's work as an internist includes the performance of the procedure that was the subject of the complaint. The complaint provides a description of the procedures at issue here and alleges the following ways in which the hospitalists deviated from the standard of care: (1) they administered Levaquin even when contraindicated by boxed warnings and when other antibiotics were available; (2) they administered a corticosteroid while plaintiff was also taking Levaquin; (3) they failed to properly identify and assess whether plaintiff was a proper candidate for the medications administered; (4) they failed to ensure proper medication reconciliation; (5) they ordered incorrect medications in excessive dosages; and (6) they discharged and transferred plaintiff with orders to continue Levaquin. These allegations all pertain to the selection and prescription of medication and a physician's responsibility to recognize potential drug interactions.

In the complaint, plaintiff also alleged other deviations from the standard of care by the hospitalists: (1) they failed to assess, obtain, and document accurate information in the medical records regarding plaintiff's medical record and medication history, (2) they discharged plaintiff without appropriately reviewing her medical chart, and (3) they failed to communicate with one another. These allegations all involve the overall care and management of a patient.

Thus, for purposes of our decision, the procedure that is the subject of the complaint includes the selection, prescription, and management of medication in the overall care of a patient. This includes, or course, a physician's responsibility to recognize drug warnings and interactions.

Defendant argues that this characterization of the procedure is too broad because "just about every physician prescribes medications and makes referrals." However, if the physician is a specialist, Rule 702(b) also requires that the procedure be part of a similar specialty. Thus, not every physician who selects, prescribes, and reconciles medications in the overall care and management of a patient would be qualified to testify here. Pursuant to Rule 702(b), the physician must do these things within the context of a similar specialty *and* have experience treating patients similar to the plaintiff.

It is clear from Dr. Genecin's testimony that his practice as an internist includes the procedures alleged here. He testified that he has experience reading and understanding the labeling of drugs, selecting and prescribing drugs, and recognizing potential reactions between drugs. He has also prescribed Levaquin to patients in the past. When working at the Yale Health Center, he does "all of the direct patient-care activities involved in internal medicine practice." This includes making referrals, reading results, and writing prescriptions. Dr. Genecin also works as an attending physician in a hospital two months out of the year, where his primary duty is patient care. This includes admitting patients, assessing patient history and clinical findings, reading test results, assessing patient problems, recommending treatment appropriate to patient needs, and planning for the discharge and appropriate transition of patients. Dr. Genecin also testified that as an internist in the hospital his "role is identical [to that of the hospitalists] with respect to the care provided to the patients." Again, the record contains no evidence to the contrary. We conclude

that this testimony is sufficient to satisfy the requirement that Dr. Genecin's practice as an internist includes the procedures alleged in the complaint.

Next, we review the record to determine whether Dr. Genecin has prior experience treating patients similar to Mrs. Pierce. When asked about this in his deposition, he responded with the following:

> I see patients of Mrs. Pierce's demographic, elderly female patients in their 70s, many dozen per year in the hospital setting, admitted through the hospital with serious infections of one sort or another including, frequently, with infection arising in the urinary tract including the kidney.
> . . .

Later in the same deposition, he explained Mrs. Pierce's condition: "[S]he was an elderly patient with sepsis, urosepsis, needing I.V. antibiotics and inpatient care." Dr. Genecin was then asked if he had seen patients like her in the emergency room when he was acting as an attending physician and he responded, "yes, all the time." This evidence showed without equivocation that Dr. Genecin had prior experience with patients similar to Mrs. Pierce.

Third and finally, in order to qualify to testify against the hospitalists, Dr. Genecin must have spent the majority of his professional time the year prior to Mrs. Pierce's hospitalization in active clinical practice as an internist or hospitalist or instructing students in the hospitalist specialty. Clinical practice is the active practice of seeing patients in a clinical setting. *See FormyDuval v. Bunn*, 138 N.C. App. 381, 391, 530 S.E.2d 96, 103 (2000) ("Clinical is defined as 'based on or

pertaining to actual experience in the observation and treatment of patients.' " (citation omitted)).

Dr. Genecin testified without objection that in the year prior to Mrs. Pierce's hospitalization he spent 55%–60% of his overall professional time in clinical practice as an internist, including two months of the year in which he practiced internal medicine in a hospital full time. As explained above, there is evidence in the record that Dr. Genecin's clinical practice included the performance of the procedure that is the subject of the complaint and that he had experience treating patients similar to plaintiff. Thus, we conclude that the evidence shows without contradiction that Dr. Genecin spent the majority of his professional time the year prior to Mrs. Pierce's hospitalization in the active clinical practice of a qualifying specialty similar to the hospitalists.

The record contains undisputed evidence that Dr. Genecin meets each of the applicable requirements of Rule 702(b). Therefore, we conclude that Dr. Genecin may properly offer expert testimony on the standard of care against the hospitalists. We conclude that the trial court erred as a matter of law and affirm the decision of the Court of Appeals on this issue.

### III.    Proximate Cause

We review de novo a trial court's order granting summary judgment. *Sykes v. Health Network Solutions, Inc.*, 372 N.C. 326, 332, 828 S.E.2d 467, 471 (2019). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C.G.S. § 1A-1, Rule 56(c) (2019). We review the evidence in the light most favorable to the non-moving party. *McCutchen v. McCutchen*, 360 N.C. 280, 286, 624 S.E.2d 620, 625 (2006).

"Proximate cause is ordinarily a jury question." *Turner v. Duke Univ.*, 325 N.C. 152, 162, 381 S.E.2d 706, 712 (1989) (citing *Conley v. Pearce-Young-Angel Co.*, 224 N.C. 211, 29 S.E.2d 740 (1944)). In a case like this one where the allegations in the complaint and the evidence in the record indicate that there may be multiple proximate causes of the plaintiff's injury, a genuine issue of material fact remains, and summary judgment is not proper. *See King v. Allred*, 309 N.C. 113, 118, 305 S.E.2d 554, 558 (1983) (holding that where the facts did not preclude a finding by the jury that defendant's negligence "was *a* proximate cause or *the* proximate cause" of the injury, the court could not conclude as a matter of law that the negligence of the defendant was the sole proximate cause of plaintiff's injury and summary judgment was not proper).

During his deposition, Dr. Genecin stated repeatedly that the prescription of Levaquin caused plaintiff's injury. He testified that:

> Levaquin was the cause of the tendon rupture that Mrs. Pierce had within the classic time frame, less than 30 days of therapy; in the classic location, the Achilles tendon; under the circumstances that are described in the black box warning, an elderly woman treated with Levaquin while on prednisone.

He went on to reiterate:

Q:      . . . In addition to your opinions on standard of care, . . . do you have an opinion, Doctor, to a reasonable degree of medical certainty . . . as to whether or not Ms. Pierce suffered any injury that was proximately caused by being prescribed Levaquin when she's over the age of 60 and concomitantly taking a corticosteroid?

. . .

A:      I do have an opinion.

Q:      And that is?

. . .

A:      That she suffered a tendon rupture as a consequence of unsafe use of Levaquin because of her age and corticosteroid use.

In the light most favorable to the plaintiff, a jury could reasonably find that "unsafe use of Levaquin" refers to the unsafe prescription of Levaquin by *any* of the doctors treating Mrs. Pierce, including the hospitalists.

Defendant asks us to find that the following exchange during cross-examination negates these affirmative statements of causation:

Q:      . . . Would you agree with me that all you can say, with respect to any connection between the Levaquin and the resulting injury to Ms. Pierce, is that if the Levaquin had been stopped by [any of the hospitalists] that all that would have done would have been to reduce the risk or, say it another way, improve her chances of avoiding an Achilles tendon rupture?

A:      That's true. . . . the shorter the duration, the less the risk. . . . It's best not to start it if you can avoid it in a situation like this. But the shorter course is safer than the long course.

This exchange during cross examination does not negate Dr. Genecin's consistently expressed opinion that Levaquin caused the injury. Though the evidence shows that Mrs. Pierce had already been prescribed Levaquin by the emergency room physician when she was formally admitted into the care of the hospitalists, plaintiff is not required to prove that the hospitalists' prescription of Levaquin was the sole or exclusive cause of her injury, only that it was a proximate cause. *See Turner*, 325 N.C. at 162, 381 S.E.2d at 712 ("When a defendant moves for a directed verdict in a medical malpractice case, the question raised is whether the plaintiff has offered evidence of each of the following elements of his claim for relief: (1) the standard of care, (2) breach of the standard of care, (3) *proximate causation*, and (4) damages." (emphasis added)).

Here, Dr. Genecin's testimony during direct examination is not negated by, and is not even necessarily inconsistent with, the quoted excerpt from the cross-examination. Taken in the light most favorable to plaintiff, a jury could find that the prescription of Levaquin was a cause of Mrs. Pierce's injuries and that the hospitalists' continued prescription of Levaquin was or was not a contributing cause. That is for the jury to decide.[5]

---

[5] We note that, to the extent that the parties argued it, we do not rely on *Gower v. Davidian*, 212 N.C. 172, 193 S.E. 28 (1937), or the loss of chance doctrine in support of our holding.

We conclude that plaintiff presented sufficient evidence of proximate cause such that summary judgment is inappropriate. We affirm the decision of the Court of Appeals as to this issue.

## IV.    Conclusion

We conclude that Dr. Genecin was qualified to testify to the standard of care and that his testimony sufficiently forecasted proximate cause. As a result, we affirm the decision of the Court of Appeals to reverse the trial court's order disqualifying Dr. Genecin as an expert witness, and we affirm the decision of the Court of Appeals to vacate the trial court's order allowing summary judgment due to lack of expert testimony. We also affirm the decision of the Court of Appeals to reverse the trial court's order granting summary judgment due to lack of evidence of proximate cause.


AFFIRMED.

Justice DAVIS concurring in part and dissenting in part.

I concur with the portion of the majority's opinion holding that Dr. Genecin was qualified to testify as an expert witness and offer an opinion at trial. However, for the reasons stated in Justice Newby's dissent, I respectfully dissent from the portion of the majority's opinion holding that plaintiff presented sufficient evidence on the issue of proximate cause through Dr. Genecin's testimony to overcome defendants' motion for summary judgment. Accordingly, I would hold that the Court of Appeals erred in reversing the trial court's entry of summary judgment in favor of defendants.

Justice NEWBY dissenting.

To succeed in this medical malpractice case, plaintiff must show that defendants violated the applicable standard of care by continuing the administration of Levaquin in a hospital setting to a patient who is suffering from a life-threatening infection. Further, plaintiff must demonstrate that a violation of the standard of care proximately caused Pierce's injury. Plaintiff has only one expert witness to establish the standard of care, breach of that standard by defendants, and whether the breach proximately caused the injury: Doctor Genecin. Dr. Genecin testified via a trial deposition. In properly applying the statutory and case law, the trial court determined Dr. Genecin did not meet the statutory requirements to render an expert opinion critical of defendants. In addition, after carefully evaluating Dr. Genecin's testimony, the only evidence of proximate causation, the trial court found the evidence inadequate to establish proximate causation. The trial court was correct. Dr. Genecin, an internal medicine physician, does not qualify to testify about the standard of care of hospitalists. Similarly, Dr. Genecin's testimony does not establish that the actions of the hospitalists caused plaintiff's injuries.

In its decision reversing the trial court, the majority undermines the General Assembly's carefully crafted statutory scheme designed to ensure that only colorable medical malpractice claims are presented to juries. The majority asks the wrong questions and therefore gets the wrong answers. First, considering whether Dr.

Genecin is qualified to testify against defendants, the majority asks the broad question of whether the general medical work involved in this case is the sort of work that Dr. Genecin often performs. It instead should have asked whether Dr. Genecin's specialty often requires him to perform the actual care at issue; whether he frequently must decide whether to continue a patient with a life-threatening condition on a medication that had been prescribed by someone else and that appears to be helping the patient recover. To reach its result, the majority undermines the longstanding deferential standard of review, which recognizes the factual nature of the inquiry into an expert witness's qualifications. It now designates this inquiry to be a legal issue. Second, the majority asks whether Dr. Genecin testified that the relevant medication, Levaquin, proximately caused the tendon rupture. It instead should have asked whether Dr. Genecin testified that the *procedure at issue*, the hospitalists' continued administration of Levaquin that had already been prescribed, proximately caused the rupture. Regardless, Dr. Genecin's testimony was only that Levaquin increased the risk of the injury. Because the trial court correctly answered the right questions, I respectfully dissent.

Seventy-six-year-old Dolores Pierce arrived at WakeMed Cary Hospital on 30 October 2012, with severe confusion, a fever, and weakness. Upon initial examination, the emergency room physician[1] thought that Pierce had a serious infection that was inducing sepsis, and prescribed her Levaquin, a common antibiotic,

---

[1] The emergency room physician who originally prescribed Levaquin is not a defendant in this case.

to be administered intravenously. Levaquin is associated with an increased risk of tendon injury, but, for those with risk factors similar to those of Pierce, the antibiotic only presents about a three percent chance of such an injury.[2] The emergency room physician admitted Pierce to the hospital, and she was transferred to the hospitalists' care. The hospitalists diagnosed her with sepsis and identified her as "critically ill." But they noticed that the Levaquin appeared to be helping fight her infection. They continued the Levaquin prescription to treat Pierce's infection. Pierce remained in the hospital until 5 November 2012 when she had substantially recovered from her infection and was ready to be discharged. At that time, she was transferred to a rehabilitation facility and was instructed to continue Levaquin, along with her daily Prednisone, for four more days. On 19 November 2012, ten days after Pierce stopped taking Levaquin, she experienced a left Achilles tendon rupture.

Plaintiff sued the hospital and the hospitalists for negligence. Plaintiff identified Dr. Genecin as an expert witness. Dr. Genecin specializes in internal medicine, but, by his own admission, is not a hospitalist. For only two months of the year, less than seventeen percent of his professional time, Dr. Genecin treats hospitalized patients as an attending physician. Most of his professional time he oversees outpatient care at a clinic. Dr. Genecin testified that working in such an

---

[2] Dr. Genecin testified that around three out of every one thousand Levaquin takers suffers a tendon rupture, and that for those with certain risk factors like Pierce, the risk of such an injury is between three and ten times greater than that of the general population of Levaquin takers. Thus, even interpreting these numbers to indicate the greatest risk, Levaquin only poses about a thirty in one thousand, or three percent, risk of tendon rupture for those with risk factors like Pierce's.

office practice is different than caring for patients in a hospital setting as an attending physician. Nevertheless, plaintiff sought to introduce Dr. Genecin's testimony that in his professional opinion the hospitalists' continued administration of Levaquin to Pierce represented conduct that fell below the applicable standard of medical care.

Dr. Genecin also offered plaintiff's only evidence on the issue of whether the hospitalists' administering of Levaquin proximately caused Pierce's tendon rupture. He testified that many different factors can increase the risk of a tendon rupture, including a patient's age, a patient's taking of corticosteroids, a patient's history of having a kidney transplant, and a patient's taking of Levaquin. Focusing on the Levaquin risk factor, Dr. Genecin's testimony indicated that, for someone who possesses all the risk factors Pierce had, the chance of suffering a tendon injury from the Levaquin is only around three percent. Dr. Genecin nevertheless named Levaquin as the cause of Pierce's injury. But, on cross examination, he admitted that other factors likely contributed to the rupture, and that all he could say was that her chances of avoiding injury would have been better had the hospitalists not continued her Levaquin treatment as they did. He also admitted that he himself prescribed Levaquin to his patients and agreed that "the Levaquin effectively treated [Pierce's] infection and she survived that potentially life-threatening disease." Dr. Genecin's deposition testimony was the only evidence presented by plaintiff on the issues of defendants' standard of care and whether defendants' conduct proximately caused Pierce's tendon rupture.

Defendants moved to disqualify Dr. Genecin as an expert witness, and moved for summary judgment. The trial court reviewed the record evidence and granted both motions. The Court of Appeals reversed.

An appellate court should reverse a decision of the trial court that a witness does not qualify to testify as an expert under Rule 702 only if the trial court abused its discretion. *State v. McGrady*, 368 N.C. 880, 893, 787 S.E.2d 1, 11 (2016). A trial court abuses its discretion if "its ruling was manifestly unsupported by reason and could not have been the result of a reasoned decision." *State v. Riddick*, 315 N.C. 749, 756, 340 S.E.2d 55, 59 (1986). In recognition of the fact-intensive nature of the inquiry, trial courts are granted "wide latitude" in determining if an expert is qualified to testify under Rule 702. *Moore v. Proper*, 366 N.C. 25, 30, 726 S.E.2d 812, 817 (2012) (quoting *State v. Bullard*, 312 N.C. 129, 140, 322 S.E.2d 370, 376 (1984)). As this Court said in *McGrady*, "[t]he standard of review [of a trial court's decision under Rule 702] remains the same . . . even when the exclusion of expert testimony results in summary judgment and thereby becomes 'outcome determinative.' " 368 N.C. at 893, 787 S.E.2d at 11 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142–43, 118 S. Ct. 512, 517 (1997)). However, a trial court's decision to grant summary judgment is reviewed de novo. *Sykes v. Health Network Sols., Inc.* 372 N.C. 326, 332, 828 S.E.2d 467, 471. (2019).

Here, while citing the correct deferential standard of review of the trial court's determination of the expert's qualifications, the majority conducts a de novo review, stating that questions about the meaning of statutes like Rule 702 are questions of

law to be reviewed de novo. Certainly a bona fide question of statutory interpretation should be reviewed de novo, but such a question is not at issue in this case. The question here simply concerns the rule's *application to the facts*, in other words, whether plaintiff's purported expert witness in fact has the requisite specialized training and experience qualifying him to testify against the hospitalists under Rule 702. How the nature of a witness's work and the length of time the witness spends performing that work is a question of law instead of fact, the majority does not say. As evidenced by its analysis, the majority simply reweighs the evidence to reach its result. It ignores the differing nature of the work of hospitalists and clinicians and decides, contrary to the trial court's decision, that Dr. Genecin's work is similar enough to the defendants' work to qualify him to testify. This approach contradicts our case law. In *McGrady*, we plainly said that a trial court's decision that a witness does not qualify to testify as an expert under Rule 702 is reviewed for an *abuse of discretion*. 368 N.C. at 893, 787 S.E.2d at 11.

Through Rule 702(b), the General Assembly has established strict criteria that must be met for someone to qualify as an expert witness competent to testify against a medical professional. Under the rule's first requirement, the proffered witness must either specialize in the same specialty as the party against whom the testimony is offered, or be of a similar specialty that includes the medical care at issue and have experience treating the same sort of patients. N.C.G.S. § 8C-1, Rule 702(b)(1) (2019). Under the rule's second requirement, the witness, in the year leading up to the occurrence that is the basis for the action, must

> have devoted a majority of his or her professional time to either . . . [t]he active clinical practice of the same health profession in which the party against whom or on whose behalf the testimony is offered, and if that party is a specialist, the active clinical practice of the same specialty or a similar specialty *which includes within its specialty the performance of the procedure that is the subject of the complaint* and have prior experience treating similar patients; or [t]he instruction of students in an accredited health professional school or accredited residency or clinical research program in the same health profession in which the party against whom or on whose behalf the testimony is offered, and if that party is a specialist, an accredited health professional school or accredited residency or clinical research program in the same specialty.

N.C.G.S. § 8C-1, Rule 702(b)(2) (emphasis added). The trial court reasonably found that Dr. Genecin does not satisfy these requirements.

Neither the trial court, nor the Court of Appeals, nor the majority of this Court assert that Dr. Genecin is of the same specialty as the hospitalists.[3] The majority instead holds that Dr. Genecin's practice is of a similar specialty to that of the hospitalists. Though all these doctors are trained in and practice internal medicine, the nature of a hospital practice and that of an outpatient clinic are vastly different. Yet, as the majority notes, it is not enough for the witness to work in a similar specialty. His specialty must also include the procedure at issue in the lawsuit, and he must have spent the majority of his professional time working in that similar

---

[3] Though the majority does not do so, I would hold that Dr. Genecin and the hospitalists are not of the same specialty because of the hospitalists' unique form of care, which is administered in a hospital under more emergency circumstances than in a clinic.

specialty that includes the procedure at issue (or teaching in such a specialty). N.C.G.S. § 8C-1, Rule 702(b)(1)–(2).

Dr. Genecin's specialty as an internist at an outpatient clinic does not include the procedure at issue here. The majority states that the medical care at issue in this case is "the selection, prescription, and management of medication in the overall care of a patient." But that characterization is too broad.[4] The majority asks a general question about whether both Dr. Genecin and the hospitalists prescribe medications, when it should ask a more specific question tailored to the medical care actually at issue in this case. The procedure at issue is the hospitalists' overseeing of the *continued* administration of Levaquin to Pierce after an emergency room physician had already started her on the medication and after it appeared to be helping her recover from a potentially life-threatening infection. Defendants thus were called to provide patient care for Pierce in the midst of an ongoing medical emergency.

Dr. Genecin's clinical work does not, however, involve such emergency decisions and the precise cost-benefit analyses which they entail. Indeed, Dr. Genecin agreed that the administering of Levaquin appears to have helped Ms. Pierce recover from a potentially life-threatening infection. Patients at Dr. Genecin's clinic who appear to be in serious condition are referred from the clinic to the hospital for the hospital to administer emergency care. Dr. Genecin may be an expert in internal

---

[4] Moreover, the majority's statement that the relevant care includes "selection" of medication is misleading. The hospitalists had no role in the original selection of Levaquin (or Prednisone). Instead, their role was to *continue* Pierce on Levaquin that was already being administered at the direction of a doctor who is not a party to this case.

medicine, and his clinical practice may call on him to understand how medications like Levaquin affect people with various risk factors. But his clinical practice does not call on him to exercise medical judgment about whether a person who is suffering from a life-threatening infection should continue taking a medication that has already been administered and which appears to be fighting the infection effectively, but may marginally inflate other risks. In his day-to-day work Dr. Genecin does not make such judgment calls, which require specialized medical training and expertise. Because the practice in which he spends the majority of his professional time does not include the medical care at issue in this case, the trial court properly disqualified him as an expert witness and did not allow him to testify regarding the hospitalists' medical care.

Dr. Genecin does have limited experience treating similar patients in a hospital setting, as he spends some time working at Yale New Haven Hospital as a hospital attending physician. But he does not spend the majority of his professional time in such a setting as required by the statute. Instead, by his own testimony, he spends only about two months out of the year at the hospital, roughly seventeen percent of his professional time.

The trial court did not abuse its discretion when it disqualified Dr. Genecin from testifying as an expert witness regarding whether the hospitalists' continued administration of Levaquin fell below the applicable standard of medical care. The

majority's decision to the contrary inserts this Court into what is ultimately a factfinding role assigned to the trial court.[5]

The trial court's grant of summary judgment to defendants should be affirmed as well on the ground that plaintiff did not put forth sufficient evidence that defendants' actions were the proximate cause of Pierce's injury. In a medical malpractice case, "the plaintiff must establish proof of a causal connection between the negligence of the physician and the injury complained of by the testimony of medical experts." *McGill v. French*, 333 N.C. 209, 217, 424 S.E.2d 108, 113 (1993). Thus, to survive summary judgment, plaintiffs had to present evidence that it was probable, in other words, more likely than not, that defendants' purported negligence caused the injury. This Court has long held that it is not sufficient for a plaintiff to simply show that a different course of treatment by the defendant physician would have increased the plaintiff's chances of avoiding the injury. *See Gower v. Davidian*, 212 N.C. 172, 175–76, 193 S.E. 28, 30–31 (1937). So, unless the evidence, viewed in plaintiff's favor, shows that the hospitalists' conduct of continuing Pierce on Levaquin at the dosage and length of time they did probably caused her tendon rupture, the trial court's grant of summary judgment in defendants' favor should be affirmed.

---

[5] The majority also notes that defendants raised "no objection to [Dr. Genecin's] testimony" in his video deposition. If the majority means to say Dr. Genecin's qualifications to testify as an expert are uncontested, it is obviously incorrect. From the beginning defendants have contested Dr. Genecin's qualifications to testify as an expert against them, and the trial court decided in defendants' favor on that point.

The majority again frames the question too broadly. Instead of asking whether Dr. Genecin testified that the actual medical care of the hospitalists proximately caused the tendon rupture, the majority is content to fixate on his testimony that Levaquin in general was the cause, even though Dr. Genecin vacillated on even that statement.

Dr. Genecin never offered any testimony to the specific and central point that defendants' failure to discontinue Levaquin caused Pierce's Achilles tendon rupture. Rather, he testified that "*Levaquin* was the cause of the tendon rupture." (emphasis added). The Levaquin was not, however, prescribed only by the hospitalists. An emergency department physician originally began intravenous administration of the medication, and the hospitalists continued Pierce on that medication after diagnosing her with a dangerous infection and noting that Levaquin appeared to be effectively treating her infection. It is the conduct of the hospitalists that is at issue. But the relevant testimony from Dr. Genecin on proximate cause does not target that conduct.

Moreover, Dr. Genecin later clarified and qualified his statement regarding Levaquin as the cause of injury by agreeing that "all [he could] say" was that the hospitalists discontinuing the Levaquin would have "reduce[d] the risk or . . . improve[d] [Pierce's] chances of avoiding an Achilles tendon rupture." This assertion is not enough to show proximate causation. Again, this Court's decision in *Gower* illustrates that a plaintiff cannot survive dismissal on the issue of causation simply by showing that another course of treatment would have reduced the risk of the injury. By qualifying his statements as he did, Dr. Genecin demonstrated that he was

unable to say whether the administration of Levaquin was a substantial cause of the tendon rupture at all, not to mention whether the specific continuance decisions of the hospitalists proximately caused the injury. Instead, Dr. Genecin testified regarding a study that showed the risk of a tendon injury from taking Levaquin is only around three in one thousand, and that this risk is likely three to ten times higher for people with various risk factors. Thus, his testimony indicates at most around a thirty in one thousand, or *three percent*, risk of a tendon injury for those with risk factors like Pierce who take Levaquin. This Court has held that when an expert testifies merely to a possible cause of the injury, that testimony is insufficient to create a material issue of fact about whether the subject of the testimony proximately caused the plaintiff's injury. *See Gillikin v. Burbage*, 263 N.C. 317, 324–25, 139 S.E.2d 753, 759–60 (1965). By holding otherwise, the majority quietly applies the "loss of chance" doctrine, nonexistent under North Carolina law, which changes the traditional requirement of proximate cause and allows a plaintiff to prevail if she demonstrates that the medical care affected her *chance* of good health, no matter how small the effect may be. Under existing North Carolina law regarding proximate cause, Dr. Genecin's testimony did not establish a material issue of fact regarding, or amount to sufficient evidence of, proximate cause, and the trial court's grant of summary judgment was appropriate.

Rule 702 helps ensure that reliable evidence is presented to support a plaintiff's medical malpractice claim. A jury may be substantially swayed by anyone with the title of "doctor," even if that doctor lacks the specialization and experience

necessary to provide reliable testimony on the proper standard of professional medical care. Rule 702 thus limits expert testimony to those doctors who, through relevant training and experience, have significant information to contribute to the factfinder. Dr. Genecin undoubtedly possesses substantial knowledge and skill in internal medicine generally; but his practice does not require him to regularly make emergency decisions about a hospitalized patient's care, which hospitalists must routinely make. The majority, by framing the question of Dr. Genecin's specialization so broadly, misses this critical distinction. Moreover, the majority reweighs the evidence to reach its conclusion. The trial court did not abuse its discretion by disqualifying Dr. Genecin as an expert as to the hospitalists' medical care at issue in this case. Further, because Dr. Genecin did not, and could not, testify that the hospitalists' care caused Pierce's tendon rupture, plaintiff did not present sufficient evidence of proximate causation, and the trial court appropriately granted summary judgment in defendants' favor. The trial court's decision was correct, and the decision of the Court of Appeals should be reversed.

I respectfully dissent.

Justice MORGAN joins in this dissenting opinion.